UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| DOUGLAS JORDAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  3:16-CV-122-PLR-CCS |
| | ) | |
| BLOUNT COUNTY, JAMES BROOKS, and | ) | |
| SCOTT CARPENTER, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Douglas Jordan was convicted of second-degree murder in October of 2002.  Following denial of his direct appeal, Jordan filed a petition for post-conviction relief.  In the post-conviction proceedings, Jordan discovered that Blount County detectives found a knife during their investigation that was never provided to his criminal defense attorney.  Jordan also discovered investigative documents – one detailing how the knife was discovered, and a memo dated March 13, 1998, regarding interviews with potential other suspects in the case that were never disclosed.  On January 25, 2011, the Tennessee Court of Criminal Appeals determined that Jordan was entitled to a new trial due to the non-disclosure of the knife and investigative documents.  *Jordan v. State*, 343 S.W.3d 84, 97-100 (Tenn.Ct.App. 2011).  Jordan was retried and acquitted on March 28, 2015.

Jordan sues defendants pursuant to 42 U.S.C. § 1983 for violation of his rights under the First and Fourteenth Amendments and for common law negligence stemming from suppression of exculpatory evidence.

## I.  Background

The facts pertaining to the murder of Jennifer Byerly and the investigation are taken from the Tennessee Court of Criminal Appeals post-conviction relief order and the record in this case. *Jordan v. State of Tennessee,* 343 S.W.3d 84 (Tenn.Ct.App. 2011).

On March 11, 1998, Jennifer Byerly, who was deaf and mute, was at the End Zone bar on Alcoa Highway near the Knoxville airport.  An employee at the bar, Mary Roberts, who was a neighbor of Byerly, saw her "talking to the Mexicans" who frequented the bar, and, because she felt the men were acting inappropriately toward Byerly, she asked them to leave.  Byerly, who was crying, stayed in a booth.  Jordan, whom Roberts had seen in the bar several times previously, asked about Byerly and then obtained a paper and pencil before going to sit with her in the booth.  Roberts saw the two pass notes before Jordan stood and went to the restroom.  Jordan then left the bar through a back door at about 11:30 p.m., and Byerly left through the front door.

At trial, Roberts testified that during the two years Byerly had been a patron of the End Zone, she had pretty much exclusively hung around the Mexicans.  Although she initially denied having prevented Byerly from leaving with the Mexicans on the night of her death, Roberts stated that the Mexicans left the bar at 11:30 p.m., only minutes before Byerly departed.

2

Earl Horton, a bartender at the End Zone who knew Byerly and Jordan as patrons of the bar, testified that sometime between midnight and 1:00 a.m., Byerly and Jordan "had a discussion" after which Jordan left quickly though the back door and Byerly seemed upset. He testified that when Byerly left through the front door, he followed her outside and asked if she was "okay." Because he was concerned for her safety, he walked to the edge of the building to watch her leave. He saw that Jordan was waiting outside the building and when Byerly walked up to him, Horton asked if they were "okay." Jordan replied, "Yes, we're fine." Byerly nodded her head affirmatively and the two walked away in the direction of the motel next door.

At approximately 6:30 a.m. on March 12, Byerly's body was discovered on the side of Wheeler Road in Blount County about 1.2 miles from the End Zone and less than one-half mile from her apartment. She had been strangled and her throat slashed post-mortem.

Blount County Detective Scott Carpenter executed a search warrant at Byerly's apartment. He found no signs of a struggle. Officers also searched Jordan's residence, a second-floor motel room at the Airport Inn and found a crumpled note in the garbage can under the sink. The note contained a communication between Jordan and Byerly. In an interview by Detective Carpenter on the day after the murder, Jordan stated that he met Byerly four or five nights earlier while playing pool at the End Zone. He explained that because Byerly was deaf and mute, they communicated by writing notes and that Byerly asked for his address after their initial meeting and visited his residence later that night. Jordan told the detective they communicated in writing for about thirty minutes and he drove her home. Jordan stated that on the evening of the murder, he was shooting pool

3

when Roberts asked for someone to help Byerly because people were taking advantage of her. He explained that he discouraged Byerly from leaving the bar with another man and that after her Mexican friends had gone, Byerly declined his offer of a ride home. Jordan stated that Byerly left first and that he finished his beer before leaving through the back door. He initially maintained that was the last time he saw Byerly, but, later, when confronted with the note police had found in his trash can, he admitted that Byerly had been in his room that night. He stated that Byerly was waiting outside the End Zone and followed him home. Because he was interested only in sex and refused a romantic relationship with her, Byerly left his apartment after approximately fifteen minutes. Jordan denied having sex with Byerly that night and denied having killed her. He agreed to provide police with blood and hair samples and consented to have his car impounded for examination. Byerly's blood was not found in the car.

In an interview five days later, Jordan acknowledged that he was angry with Byerly on the night of the murder because "she couldn't take no for an answer." He denied, however, that he had been angry enough to kill Byerly and further denied having hit her or harmed her in any way.

Dr. David Gilliam, medical examiner, estimated that Byerly had been dead for three to five hours before her body was found. He testified that although her throat had been cut, the cause of death was manual strangulation. The cuts to her throat were done post-mortem.

Sharon Monterrosol testified that she first met Byerly at the residence of a friend the November prior to her murder. She recalled that Byerly, who was with her boyfriend,

4

Marco Villo-Gomez, had a black eye.  Monterrosol stated that at some point after Christmas 1997, some two months before the murder, she overheard Villo-Gomez say that he was going to kill "her."  Monterrosol stated that Villo-Gomez did not identify Byerly by name and that he had been drinking and was angry at the time of the remark.  She further testified that later, she again overheard Villo-Gomez, whom she described as "very drunk" and very angry," say in Spanish that he was "going to kill the bitch."  During cross-examination, Monterrosol acknowledged that Villo-Gomez appeared to care about Byerly and was "very protective" of her.  She stated that in March of 1998, Villo-Gomez lived in Morristown but would sometimes visit on weekends, staying with relatives in Byerly's apartment complex.

At trial, the defense introduced documents concerning an April 9, 1998, plea of guilty by Villo-Gomez to a charge of assault involving Byerly.  The warrant completed by Byerly stated that on October 16, 1997, while at her own residence, she and Villo-Gomez became engaged in an argument when without provocation Villo-Gomez "struck her several times about the arms and chest in a knowing, intentional, and reckless manner."  The judgment reflected that Villo-Gomez received a sentence of eleven months, twenty-nine days for assaulting Byerly.

Rhonda Gillespie testified that Byerly and Villo-Gomez ended their romantic relationship at the beginning of December 1997, and Gillespie had not seen Villo-Gomez since that time.

David Cockrill, Byerly's next door neighbor, testified that Byerly generally frequented with Mexicans who lived in the apartment complex.  He stated that Byerly was

5

unemployed and received a Social Security disability check every month but that she would often use her money to purchase beer and cigarettes for the Mexicans. He recalled being awakened at approximately 3:00 a.m. the night of Byerly's death by a disturbance at her apartment. Cockrill described overhearing a male voice shouting angrily in Spanish, which he could not understand. He could also hear Byerly grunting, which "was about the only noise she could make." Cockrill told police about the incident, which he estimated to have lasted for about five minutes.

Connie Collins resided at the Cerritos West Apartments and lived upstairs and one door over from Byerly. She testified that she was awakened between the hours of 2:30 and 4:00 to loud arguing. It was coming from Byerly's apartment. She could hear Byerly grunting as if she was arguing back. She also heard a Hispanic male with broken English arguing with her. After the argument stopped, Collins heard the apartment door slam and she saw a red Camaro leave the parking lot in a hurry. She reported the incident to her landlord the next day. Detective Carpenter testified that Collins made a report to the police at a gas station. Detective Carpenter stated that he gave the report regarding Collins to ADA Brooks. Defense counsel Whitt admitted he had information that Collins heard a disturbance in the morning hours of March 12, but he never spoke to Collins and did not recall whether he attempted to locate Collins.

In the post-conviction proceedings, Jordan introduced documents from the investigative files of the Blount County Sheriff's Department. Exhibit 6 included a Case Memorandum prepared by Detective Carpenter on June 23, 1998, detailing a telephone call from Alicia Holloway, who advised that she knew who killed Byerly. Holloway stated that

6

she asked a Mexican named Alfredo, whom she met at the Airport Inn, whether he killed Byerly. He told her that he did and showed her the knife he used to slash her throat. The June 23 memo states that Detective Carpenter went to the Airport Inn, where the clerk directed him to rooms 224 and 225. Detective Carpenter learned that Alfredo stayed in room 225, and upon entering that room, Detective Carpenter took into evidence a knife that matched Holloway's description, which he observed lying on a table.

Exhibit 6 also included a Case Memorandum prepared by Detective Carpenter and dated June 24, 1998. This June 24 memo related Detective Carpenter's attempts to locate Holloway. Detective Carpenter contacted the company where Holloway reported that she worked, but the company advised him that they did not have an employee named Alicia Holloway. Additionally, Detective Carpenter learned that no Tennessee driver's license had been issued to an Alicia Holloway with the same birth date and address given by Holloway. He attempted to call the phone number she provided but only reached a recording that stated a long-distance access code was required to complete the call. According to the June 24 memo, Detective Carpenter concluded that the information provided by Holloway was untrue, so he did not further investigate Alfredo as a suspect.

During the post-conviction proceedings, Jordan introduced a Case Memorandum dated March 13, 1998, prepared by Detective Carpenter. The March 13 memo stated that detectives interviewed through interpreters, foreign nationals residing in the Cerritos West Apartments. This memo listed eighteen names, although there were only sixteen interview reports dated March 13. The memo stated that the detectives photographed and fingerprinted eighteen individuals, but there were only sixteen statements. There were no

7

statements from Alfredo Rubio Vaesia or Isidoro Covorrubias. Detective Carpenter explained that Vaesia and Covorrubias's names had come up during the initial canvas, but they had not been interviewed. Detective Carpenter contends they were not interviewed until June 24, 1998. Because their names had come up, Detective Carpenter stated that he erroneously included their names on the March 13 memo. The record contains a separate report prepared by Sgt. Warren Headrick stating that 18 people were interviewed on March 13 in connection with the investigation.

The record contains a statement by Alfredo Rubio Vaesia to Detective Carpenter on June 24, 1998, in which Vaesia stated that he knew a woman named Alicia. Vaesia stated that he did not tell her that he killed Byerly. He further stated that he did not live in Tennessee in March 1998. Covorrubias was also interviewed on June 24. He was Vaesia's employer and confirmed that Vaesia was not living in Blount County in March 1998. On the basis of these interviews, Detective Carpenter did not further investigate Vaesia or Covorrubias.

The record also contains a document that Jordan's counsel found in the Sheriff's Department's investigative files. The document summarized investigative activity from March 17, 1998, through June 23, 1998. The document related that on April 9, 1998, Deputy Doug Moore recovered a stainless steel paring or butcher type knife from Teresa Webb on Wheeler Road. The knife was recovered on the north side of the road approximately 3/10 of a mile from the crime scene. Deputy Moore gave the knife to CST Muncy for processing. The knife was not tested for evidence because it had been exposed to the elements and the officer concluded it was unlikely it contained any fingerprints.

8

Jordan did not learn of the knife found on Wheeler Road until the post-conviction investigation.

Defendant Carpenter was the lead investigator on the case and was responsible for gathering all the evidence, securing the evidence, preserving the evidence, and then presenting the evidence to the District Attorney's office. When investigating a murder, Carpenter kept an investigative file that was also called a "murder book." A murder book is a case file that is a compilation and documentation of all the activity on the case that is kept in a three-ring binder in separate sleeves. Carpenter resigned from the Blount County Sheriff's Department in 2004. He had no involvement in the post-conviction hearing or the second murder trial, where Jordan was acquitted.

Detective Jim Widener worked in the Criminal Investigations Division of the Blount County Sheriff's Department in March 1998. Detective Widener testified that Detective Carpenter was the lead investigator in the case and he was second to Detective Carpenter. According to Detective Widener, Detective Carpenter was in charge of maintaining documentation related to the case, including compiling the murder book. He explained that the murder book was the entire investigative file, which contained lab reports and witness interviews. Detective Widener testified that he did not meet with defense counsel during discovery but that Detective Carpenter did. He said that the Sheriff's Department had an open file policy.

James Brooks testified that in 2002, he was the Assistant District Attorney in Blount County assigned to prosecute the case against Jordan. Brooks testified that he provided open file discovery to Jordan's counsel, Jeff Whitt. He said that he and Whitt went to the

9

Sheriff's office and "went through the entire investigation file" and the physical evidence. Brooks said that he asked investigators to present their hand-written notes, and Whitt went through every note that existed in the file in his presence. He stated that he gave Whitt everything, whether in his view it was exculpatory or not.

Stanley Barnett, Jordan's first counsel, stated the Wheeler Road knife was not disclosed to him. He testified the knife would have been significant to his investigation and would have allowed him to impeach the thoroughness and reliability of the police investigation. He also stated that the March 13 memo was not disclosed. He acknowledged that the prosecutor disclosed documents from the investigative file, but the March 13 memo was not among the documents disclosed.

Jeff Whitt testified that Jordan retained him in either 2000 or 2001 to represent him after his previous counsel, Stanley Barnett, withdrew. Whitt had no recollection of law enforcement finding a knife in a field 3/10 of a mile from the crime scene. Whitt further testified that he was not familiar with the March 13 case memo. He stated that the March 13 case memo would be relevant to show that Vaesia lied to law enforcement in his June 24 statement, when he said he was not in East Tennessee until May 1998 and that he did not know anything about Byerly's murder. Whitt testified that the information was material because the evidence could have been used to maintain, or to find, some possible defense or witness. He also said that he would have cross-examined and impeached Detective Carpenter's investigation with the March 13 case memo.

Detective Carpenter testified that Blount County had an "open file policy" wherein the detectives maintained an investigative file that contained all the investigative materials

10

– reports, investigative summaries, and other materials developed by the detectives and crime scene technicians. The policy, practice, and custom of Blount County was for the detectives to provide the investigative file and all its materials to the District Attorney's office, and the DA made determinations whether materials were exculpatory and/or inculpatory. Detective Carpenter further stated that the policy, practice, and custom of Blount County was that the detectives would provide their investigative file directly to a criminal defense attorney, if requested. The policy, practice, and custom of Blount County was that no materials could be removed from the investigative file and all materials were to be provided to the DA's office. Detectives and officers were trained that all materials were to be placed and maintained within the investigative file and provided to the prosecutor's office and to defense counsel upon request.

As to physical evidence, Detective Carpenter stated the detective would mark it, give it to the CST, the CST would log the evidence, and then it would be placed into an evidence box for storage in an evidence room. If any person (detective or criminal defense attorney) wanted to check out or view evidence, that individual had to be escorted by a CST. Detective Carpenter testified that no individual could check out or view evidence without a notation being made on the log. No physical evidence was to be removed from storage unless properly noted. Detectives and officers were trained to place all physical evidence in the CST department for them to notate, place, and keep the physical evidence. Detectives and officers were also trained not to withhold any materials from the prosecutor's office or defense counsel.

11

## II. Standard of Review

The parties have filed cross-motions for summary judgment. Detective Carpenter and Blount County move to dismiss the claims against them under Federal Rule of Civil Procedure 56. Jordan moves for summary judgment arguing that the doctrines of res judicata and/or claim preclusion bar defendants from relitigating his *Brady* claims for suppression of the Wheeler Road knife and the March 13 memo.

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 330 n. 2 (1986); *Moore v. Philip Morris Co., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita elec. Indus. Co. Ltd v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Burchett v. Keifer*, 301 F.3d 937, 942 (6th Cir. 2002).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. *Celotex*, 477 U.S. at 317. To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The standards upon which the court evaluates motions for summary judgment do not change when, as here, both parties seek to resolve the case through the vehicle of cross-motions for summary judgment. The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1999).

### III. Analysis

*Qualified Immunity*

Jordan has brought wrongful conviction claims for violations under the Due Process clause related to (1) *Brady* violations, (2) destruction of evidence, (3) denial of access to the courts, and (4) state law negligence. Defendant Carpenter asserts he is entitled to qualified immunity as to any wrongful conviction claim under § 1983 and under state law.

If a police officer violates the Constitution, § 1983 provides a civil remedy for those injured by the violation. *Peffer v. Stephens,* 880 F.3d 256, 263 (6th Cir. 2018). But officers sued under the aegis of § 1983 are protected from liability by the doctrine of qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). Qualified immunity does not apply if (1) "on the plaintiff's facts," a constitutional violation occurred, and (2) the alleged violation was of

13

"clearly established constitutional rights of which a reasonable person would have known." *Hoover v. Radabaugh,* 307 F.3d 460, 465 (6th Cir. 2002).

In *Brady v. Maryland,* 373 U.S. 83, 87 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Prosecutors are not the only state actors bound by *Brady,* and "police can commit a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material." *Moldowan v. City of Warren,* 578 F.3d 351, 379 (6th Cir. 2009). "As far as the Constitution is concerned, a defendant is equally deprived of his due process rights when the police rather than the prosecutor suppress exculpatory evidence because, in either case, the impact on the fundamental fairness of the defendant's trial is the same." *Id.* at 379. Where the police have in their possession evidence that they know or should know "might be expected to play a significant role in the suspect's defense," the concealment of that evidence can never be done in good faith. *Id.* at 388-89.

*Brady* claims have three elements, (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching, (2) the evidence must have been suppressed by the State, either willfully or inadvertently, and (3) prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999).

Even though the state's obligation under *Brady* is managed by the prosecutor's office, that obligation "applies to relevant evidence in the hands of the police, whether the prosecutors knew about it or not, whether they suppressed it intentionally or not, and

14

whether the accused asked for it or not." *Moldowan,* 578 F.3d at 378. The Supreme Court has found that *Brady* "encompasses evidence known only to police investigators and not to the prosecutor." *Strickler v. Greene,* 527 U.S. 263, 280-81 (1999).

Carpenter claims he is entitled to qualified immunity because there is no "affirmative evidence" that he personally withheld any evidence. He conducted his investigation, compiled all evidence into his murder book and provided a copy of the book to the ADA. Thereafter, he would give copies of any additional materials to the ADA for inclusion in the ADA's copy of the murder book. Carpenter contends he provided all evidence to ADAs Bailey and Books, thus complying with his obligation under *Brady*. Carpenter argues he did not participate in the determination of what was exculpatory or inculpatory evidence, or otherwise participate in a determination of what evidence would be provided to defense counsel. Carpenter testified that the knife, related Case Activity Report, the March 13 memo, and the Collins statement were all present in the murder book and/or evidence room when Jordan was initially tried in 2002. And, the knife, Case Activity Report, March 13 memo, and the Collins statement were all present in the murder book and/or evidence room when Jordan's post-conviction counsel reviewed the evidence. The last time Carpenter touched the murder book was during Jordan's first trial that concluded in 2002. After trial, the murder book was taken back to the crime tech area. Carpenter resigned from the Blount County Sheriff's office in 2004. Carpenter did not participate or testify in the post-conviction proceeding.

Both defense counsel, Jeff Whitt and Stanley Barnett, testified that the March 13 memo and the Wheeler Road knife were not disclosed to them. Moreover, Whitt sent

defendants a discovery request to view the murder book as it was kept by the sheriff's office. The documents in the investigative file were kept in plastic sleeves. Counsel videotaped the contents of the file. The video shows that there are empty sleeves in the file. Jordan contends the empty sleeves could have held documents that are no longer there.

Jordan contends that the March 13 case memo shows that Vaesia was in fact interviewed by police on March 13, a day after Byerly's murder. Defense counsel testified that this document was not disclosed to them and that it was material to Jordan's defense. Counsel testified the memo is both favorable and material because it tends to show that Vaesia was present the day after the murder, that he knew about the murder, that he lied to the police about his presence, and his knowledge of the murder.

As for the Wheeler Road knife, the police failed to conduct any tests on the knife to determine if it was connected to Byerly's murder. Her throat was cut 11 times, which was consistent with a small, sharp knife; and, the knife was found in the vicinity of the crime scene. Detective Widener testified that there were tests that the state could have performed on the knife, including fingerprint, DNA, blood type, and showing the knife to potential witnesses to see if they could identity it. Detective Widener admitted that the state performed no tests or investigation of the knife. Disclosure of the knife would have enabled trial counsel to decide whether to have the knife independently tested. Jordan contends this evidence could have been used to impeach the reliability and thoroughness of the investigation and would have been material to his defense. Jordan argues that although police recovered a knife from Vaesia, the police did nothing to investigate his knife because they concluded he was not involved in Byerly's murder. Had tests established that either

16

knife was involved in Byerly's murder and implicated someone other than Jordan, the evidence would have been highly exculpatory.

ADA Brooks testified that in 2002, he provided open file discovery to Jordan's counsel, Jeff Whitt. He and Whitt went to the Sheriff's office and "went through the entire investigation file" and the physical evidence. Brooks asked investigators to present their hand-written notes, and Whitt went through every note that existed in the file in his presence. Detective Carpenter was in charge of maintaining documentation related to the case, including compiling the murder book. The murder book was the entire investigative file, which contained lab reports and witness interviews. Both of Jordan's trial counsel testified that they were unaware of the Wheeler Road knife, the Case Activity Report, and the March 13 memo; therefore, the evidence was not disclosed to them as required by *Brady*.

Construing the testimony in a light most favorable to Jordan, there is a question of material fact as to whether Detective Carpenter suppressed evidence. The Court is troubled by the testimony of not one but two defense attorneys that this evidence was not disclosed to them. The record shows that the prosecutor and defense counsel reviewed the investigative file as it was kept by Detective Carpenter in the Blount County Sheriff's Office. Jordan says evidence was withheld; defendants say it was not and defense counsel overlooked it or did not find it material. The Court does not weigh the evidence or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). This question of fact must be reserved for trial. Further, the contradictory testimony requires a determination of the testifying witnesses' credibility. The credibility

of witnesses is peculiarly within the province of the jury, and a trial court should never substitute its opinion of the credibility of witnesses for that of the jury. *Werthan Bag Corp. v. Agnew*, 202 F.2d 119, 122-23 (6th Cir. 1953).

As for Detective Carpenter's claim of qualified immunity, in 1975 it was clearly established that prosecutorial withholding of exculpatory evidence violates a criminal defendant's Fourteenth Amendment right to due process. *See Brady,* 373 U.S. at 86-87. Multiple circuits have also recognized that *Brady* claims can be based on the conduct of law-enforcement officers – as distinct from prosecutors – who have allegedly withheld exculpatory evidence. *See Jackson v. City of Cleveland,* 925 F.3d 793, 823 (6th Cir. 2019) (collecting cases). Thus, it was clearly established that Detective Carpenter had a Fourteenth Amendment obligation to disclose exculpatory evidence. The court finds Carpenter is not entitled to qualified immunity as to the Wheeler Road Knife or the March 13 memo.

*Statement of Connie Collins*

The Court finds there was no *Brady* violation relating to the statement of Connie Collins. During the post-conviction hearing, Whitt testified he was aware of Collins' statement and the fact that she was interviewed. Although he considered the statement potentially exculpatory, he never spoke to Collins and did not recall whether he attempted to locate Collins. The Court finds that Collins' statement was not withheld from Jordan. Whitt had notice that she gave a statement to police and he could have inquired or taken further action to obtain it. A reasonable defendant would have pursued that inquiry, but counsel did not do so. *See United States v. Todd,* 920 F.2d 399, 405 (6th Cir. 1990)

18

(**defendant** was aware of the essential facts that would enable him to take advantage of the exculpatory evidence). Accordingly, because the evidence was available to Jordan from sources other than the state, and counsel was aware of the essential facts necessary for him to obtain that evidence, the *Brady* rule does not apply.

## Destruction of Evidence

Jordan persists in claiming that evidence was destroyed by defendants in this case. However, as previously found by the Court, the Wheeler Road knife and the March 13 memo were found by Jordan's post-conviction counsel and thus, were not destroyed. Jordan's claim for destruction of evidence is dismissed.

## State Law Negligence Claims

Jordan asserts Detective Carpenter is personally liable under Tennessee law for negligently withholding evidence.

Defendants respond that any claim for negligence under Tennessee law should be dismissed because Detective Carpenter has immunity under the Tennessee Governmental Tort Liability Act (TGTLA) as to any general negligence claim.

Tennessee codified its sovereign immunity law in the TGTLA. Tenn. Code Ann. § 29-20-101, et seq. Section 29-20201(a) provides that "except as may be otherwise provided . . . all governmental entities shall be immune from suit for any injury which may result" from the exercise of government duties. No party may bring a suit against the State except "in such manner and in such courts as the Legislature may by law direct." *Davidson v. Lewis Bros. Bakery,* 227 S.W.3d 17, 19 (Tenn. 2007). The state includes municipalities. *Id.* The TGTLA removes immunity for "injury proximately caused by a negligent act or

19

omission of any employee within the scope of his employment," but provides a list of exceptions to this removal of immunity. Tenn. Code Ann. § 29-20-205. Injuries that arise out of civil rights are one such exception, that is, sovereign immunity continues to apply in those circumstances. *Id.*

Jordan's negligence claim against Blount County and any of its employees is governed by the TGTLA. The Sixth Circuit has held that the TGTLA's "civil rights" exception includes tort claims that arise out of civil rights violations. *Johnson v. City of Memphis,* 617 F.3d 864, 872 (6th Cir. 2010) (plain language of the TGTLA preserves immunity for suits claiming negligent injuries arising from civil rights violations). Jordan's negligence claim arises out of the same circumstances giving rise to his civil rights claim under § 1983 for violation of his constitutional rights. The Court finds that the TGTLA's civil rights exception applies and the Blount County Defendants are immune from suit on the state law negligence claim.

*Municipal Liability*

A municipality may not be held liable under § 1983 on a *respondeat superior* theory, in other words, "solely because it employs a tortfeasor," *D'Ambrosio v. Marino,* 747 F.3d 378, 388-89 (6th Cir. 2014). Instead, a plaintiff must show that "through its deliberate conduct, the municipality was the moving force behind the injury alleged." *Alman v. Reed,* 703 F.3d 887, 903 (6th Cir. 2013). A plaintiff does this by showing that the municipality had a "policy or custom" that caused the violation of his rights. *Monell,* 436 U.S. at 694.

There are four methods of showing the municipality had such a policy or custom: the plaintiff may prove (1) the existence of an illegal official policy or legislative

20

enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

The manner in which a police force chooses to train its officers is "necessarily a matter of policy." *Spell v. McDaniel,* 824 F.2d 1380, 1389 (4th Cir. 1987). Therefore, the inadequacy of police training may serve as the basis for § 1983 liability, but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton v. Harris,* 489 U.S. 378, 388 (1989). Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. *Bd. of Cty. Comm'rs v. Brown,* 520 U.S. 397, 410 (1997). In other words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be "plainly obvious." *Gregory v. City of Louisville,* 444 F.3d 727, 752 (6th Cir. 2006).

A plaintiff may meet this standard by showing either: (1) prior instances of unconstitutional conduct demonstrating that the city had notice that the training was deficient and likely to cause injury but ignored it; or (2) evidence of a single violation of federal rights, accompanied by a showing that the city had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation. *Campbell v. City of Springboro,* 700 F.3d 779, 794 (6th Cir. 2012). A custom of failing to train its officers on the handling of exculpatory materials is sufficient to establish the requisite fault

on the part of the municipality for a deliberate-indifference claim.  *Gregory,* 444 F.3d at 754.

Jordan argues that Blount County had a policy of inadequate training or supervision of its officers as to their obligation to disclose exculpatory evidence under *Brady*.  In order to show that a municipality is liable for a failure to train its employees, a plaintiff must establish that: (1) the city's training program was inadequate for the tasks that officers must perform; (2) the inadequacy was the result of the city's deliberate indifference; and (3) the inadequacy was closely related to and actually caused the injury.  *Ciminillo v. Stricher,* 434 F.3d 461, 469 (6th Cir. 2006).

Blount County admits that it provides no standardized training to officers on *Brady*, and that the training, if any, an officer receives is entirely dependent on seminars an officer elects to attend.  Blount County also admits it has no written policies or procedures on *Brady*.  Blount County relies on its open file policy to comply with its *Brady* obligations. Defendants have produced no records that Detective Carpenter was trained in an open file policy or to show that its officers in general receive training on that policy.

Blount County argues that it does not need to provide training on *Brady* because the open file policy does not require officers to exercise their discretion on what to disclose, which would require that the officer know when disclosure is mandated.  Rather, the County requires the officer to put everything in the file and give the entire file to the prosecutor.

Here, there is no dispute of material fact that Blount County provided no standardized training on *Brady* and that it did not require such training.  Any training an

22

officer receives on *Brady* is up to the individual officer.  The record also contains evidence, taken in a light most favorable to Jordan, that the County's open file policy allows its officers discretion as to what to include in their investigative files.  The Court finds there is a genuine issue of material fact as to whether Blount County's training of its officers in their disclosure obligations was sufficient, and summary judgment on this claim is inappropriate.

*Claim for Punitive Damages*

Defendants argue that Jordan cannot recover punitive damages because punitive damages cannot be awarded against a local government entity.  *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271 (1981).  Jordan has not responded to defendants' motion for summary judgment as to punitive damages and pursuant to LR 7.2, his failure to respond will be deemed a waiver of any opposition to the relief sought.  This waiver occurs both where a party expressly concedes a point and where a party fails to respond to arguments made by its opponent.  *Taylor v. Unumprovident Corp.*, 2005 WL 3448052 at *2 (E.D.Tenn. Dec. 14, 2005) (*citing Guster v. Hamilton Cnty Dept of Ed.,* 2004 WL 1854181 at *7 (E.D.Tenn. Mar. 2, 2004) (holding an argument not addressed in the responding party's brief is deemed waived).  Because Jordan did not respond to defendant's specific arguments regarding punitive damages, he has waived any opposition to the relief sought.  Accordingly, because Jordan has not shown that he can recover punitive damages against these defendants, his claim for punitive damages is dismissed.

*Statute of Limitations*

Defendants renew their argument that Jordan's claims are barred by the applicable statute of limitations. The Sixth Circuit held that the proceedings in Jordan's case did not terminate when the Tennessee Court of Appeals remanded the case for a new trial, but when Jordan was acquitted at his retrial because the criminal proceedings continued against him after the remand and only ended upon his acquittal. Thus, the Sixth Circuit Court of Appeals held that this case was filed within the statute of limitations. *See Jordan v. Blount Cnty,* 885 F.3d 413 (6th Cir. 2018). Defendants appealed to the United States Supreme Court, which denied review [Doc. 95].

Pending at the same time was *McDonough v. Smith,* 139 S. Ct. 2149 (2019). In *McDonough*, the Supreme Court held the statute of limitations for a fabricated evidence claim does not begin to run until the criminal proceedings against the defendant have terminated in his favor. *Id.* at 2155. The Court held that malicious prosecution was the most analogous claim and that it required the favorable termination of the criminal proceedings. *Id.* at 2156. The Court concluded that the statute of limitations for McDonough's § 1983 claim began to run when the criminal proceedings against him were terminated in his favor, that is, when he was acquitted at his second trial. This is in accord with the Sixth Circuit's decision in this case. None of the cases cited by defendants in their renewed argument warrant a different result. *See Savory v. Cannon,* 947 F.3d 409 (7th Cir. 2020) (Plaintiff's § 1983 claim accrued, and statute of limitations commenced when governor pardoned him, not when he was released from custody); *Mills v. Barnard,* 869 F.3d 473 (6th Cir. 2017) (limitations period on inmate's § 1983 claim of withholding evidence began to run when inmate's criminal proceeding was terminated); *Kislowski v.*

24

*Kelley,* 2020 WL 495059 (N.D.N.Y. Jan. 30, 2020) (For purpose of § 1983 claim of malicious prosecution, prosecution terminates in a plaintiff's favor when the criminal proceedings against him are terminated in a manner indicating his innocence); *Burley v. Baltimore Police Dept.*, 2019 WL 6253251 (D.Md. Nov. 22, 2019) (Claim accrued on date that criminal proceedings terminated in arrestee's favor); *Watkins v. Healy,* 2019 WL 6907350 (E.D.Mich. Dec. 19, 2019) (Favorable termination of the underlying proceedings is an essential element of constitutional claim and did not accrue until such termination occurred); *Pippin v. City of Reynoldsburg,* 2019 WL 4738014 (S.D.Ohio Sept. 27, 2019) (Plaintiff's claim accrued when the proceedings against him terminated in his favor, that is, when the prosecutor entered *nolle prosequi*).   Accordingly, the Court find Jordan's complaint timely and defendant's statute of limitations argument is without merit.

*Res Judicata/Claim Preclusion*

Jordan moves for summary judgment arguing that the doctrines of res judicata and/or claim preclusion bar defendants from relitigating his *Brady* claims for suppression of the Wheeler Road knife and the March 13 memo.   In support of the motion, Jordan asserts that defendants had the same interest in the subject matter of the litigation as the state had in the post-conviction case, i.e., proving that the evidence was not withheld and that it was neither favorable nor material.

Defendants respond that the post-conviction court was concerned with whether the State of Tennessee (the prosecutor's office) discharged its duty under *Brady* based on its "open file policy."   In doing so, the state court was concerned with the prosecutor's office and not anybody or anything associated with Blount County.   The state court was not

25

concerned with whether Blount County had an improper policy, practice, or procedure regarding *Brady* evidence and was not concerned with whether Detective Carpenter suppressed evidence. The specific issues under § 1983 were not litigated and the Blount County defendants were not in privity to the parties involved in the post-conviction proceeding.

Federal courts must apply state collateral estoppel law when determining whether a state court's judicial determination has preclusive effect in a § 1983 action. *Haring v. Prosise,* 426 U.S. 306, 313 (1983). Under Tennessee law, the party asserting a defense predicated on res judicata or claim preclusion must demonstrate (1) that the underlying judgment was rendered by a court of competent jurisdiction, (2) that the same parties or their privies were involved in both suits, (3) that the same claim or cause of action was asserted in both suits, and (4) that the underlying judgment was final and on the merits. *Lien v. Couch,* 993 S.W.2d 53, 56 (Tenn.Ct.App. 1998). Defendants acknowledge that the underlying judgment was rendered by a court of competent jurisdiction and that the judgment was final and on its merits. However, they argue Jordan's arguments for res judicata/claim preclusion fail because the Blount County defendants were not parties or in privity to actual parties in the post-conviction proceeding and the "same claim or cause of action" was not asserted in the post-conviction proceeding.

The Sixth Circuit has rejected Jordan's argument for offensive claim preclusion in § 1983 cases. Specifically, the Sixth Circuit holds that any officer in his individual capacity and the governmental entity responsible for the investigation of a criminal matter are not considered the same or in privity to the prosecuting authority in charge of litigating an

26

underlying criminal matter. *Hardesty v. Hamburg Twp.,* 461 F.3d 646 (6th Cir. 2006) (police officer defendants in a § 1983 case are not in privity with the prosecution of a related criminal case and do not have a personal stake in the outcome of the criminal case); *Burda Bros. v. Walsh,* 22 Fed. Appx. 423 (6th Cir. 2001) (rejecting attempt to use collateral estoppel offensively against a defendant officer in a § 1983 action because the officer was not party to or in privity with a party to the state criminal action); *Kegler v. City of Livonia,* 173 F.3d 429 j(6th Cir. 1999) (same); *Wallace v. Mamula,* 30 F.3d 135 (6th Cir. 1994) (same).

Here, the Court finds the Blount County defendants did not have an interest which was bound by the state proceeding. Blount County was not a party to the state proceeding. Detective Carpenter was not a party to the proceeding, was not a witness, and was not asked to participate. These defendants did not have a full and fair opportunity to litigate the § 1983 issues since they had no control over the state proceeding and they did not control the state's presentation of the case. The Blount County defendants had no reason to assert any defenses that would otherwise be applicable in a civil suit and they had no right to appeal the state proceeding, all of which denied them a full opportunity to contest the state findings. Accordingly, the Court finds Jordan is not entitled to summary judgment regarding any *Brady* claim based on the res judicata/claim preclusion doctrines.

Based on the Sixth Circuit authority cited above, the Court finds the Blount County defendants are not barred from litigating whether there was a *Brady* violation or whether they may be held liable.

27

Accordingly, plaintiff's motion for summary judgment [Doc. 119] is **DENIED in its entirety;** defendants' motion for summary judgment [Docs. 113, 124] is **GRANTED in part and DENIED in part as follows:**

1. Detective Carpenter is not entitled to qualified immunity.

2. There was no *Brady* violation relating to the statement of Connie Collins.

3. Jordan's claim for destruction of evidence is dismissed.

4. Jordan's claim for negligence under Tennessee law is dismissed.

5. Blount County's motion for summary judgment is denied.

6. Jordan's claim for punitive damages is dismissed.

**IT IS SO ORDERED.**

_____
**CHIEF UNITED STATES DISTRICT JUDGE**